## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

ANTHONY LIBERATORE,
ELIZABETH LIBERATORE,
MARK LIBERATORE,
MICHAEL LIBERATORE,

      **Plaintiffs,**

v.                               **Civil Action No: 1:04cv618**

LIFE ENERGY & TECHNOLOGY HOLDINGS, INC.,
CHRISTOPHER McCORMACK, SALIM GHAFARI,
ALBERT REYNOLDS, AND WAYNE HARTKE,

      **Defendants.**

### ORDER

At the close of Plaintiffs' case on April 22, 2005, Defendant Life Energy and Technology Holdings, Inc. ("LETH") filed a FED. R. CIV. P. 50(a)(1) Motion as to Plaintiffs' Counts 1- 4 and Defendant Hartke filed a FED. R. CIV. P. 50(a)(1) Motion as to Plaintiffs' Count 1.

The Court **DENIED** Hartke's Rule 50 Motion.[1]

As to Defendant LETH's Rule 50 Motion, the Court **FOUND** that Plaintiffs had asserted a prima facie case as to the merits of the breach of contract claim, the fraud claim, the constructive fraud claim, and punitive damages[2], but took the ruling under advisement pending the Court's determination of whether the Plaintiffs could submit both the breach of contract claim and the

---

[1]Hartke renewed his Rule 50 motion at the conclusion of the evidence and after the verdict, but there were no new developments that would change the Court's ruling.

[2]Plaintiffs dropped their claim for unjust enrichment, Count 4.

fraud claim to the jury.  At the close of evidence Defendant LETH renewed its Rule 50 Motion,

the Court **RULED** that both claims would go to the jury.  The question was ultimately made moot

by the jury's verdict which found that the total damages the Plaintiffs suffered from the surrender

of their stock under the fraud counts was $1,360,800, and while the jury awarded damages of

$850,000 for breach of contract they further found that the total compensatory damages under all

theories was $1,360,800.[3]

      This Order explains the Court's rationale.

## PROCEDURAL BACKGROUND

      Plaintiffs filed a complaint on May 27, 2004 against LETH, Christopher McCormack,

Salim Ghafari, and Albert Reynolds.[4]  See Doc. 1.  Plaintiffs filed an amended complaint on June

29, 2004, adding Wayne Hartke as a Defendant.  See Doc. 10.

      On March 7, 2005 Defendants LETH and Hartke filed a motion for summary judgment,

see Doc. 155 & 157, respectively, to which Plaintiffs' responded on March 18, 2005, see Doc.

162, and to which Defendants replied on March 23, 2005, see Doc. 164 & 165, respectively.  At a

hearing held on March 25, 2005, the Court reserved ruling on the motion until trial.

      The jury trial began on April 18, 2005.[5]  The Plaintiff rested on April 22, 2005 at which

---

[3]Although an entry on the verdict form reads $1,360,000, the Court notes that this figure is a scribe's error and another entry confirms it should be $1,360,800.

[4]McCormack, Ghafari, and Reynolds were never served.

[5] On April 18, 2005, the Court entered a consent order dismissing with prejudice counts 7-11 of Plaintiffs' amended complaint.  See Doc. 184.   The remaining counts before the court at trial were:
    count 1: Fraud against Defendants Hartke and LETH.
    count 2: Constructive Fraud and Negligent Misrepresentation against Defendant LETH.
    count 3: Breach of Contract against Defendant LETH.
    count 4: Unjust Enrichment against Defendant LETH.
    count 5: Breach of Anthony Liberatore's employment contract against Defendant LETH.
    count 6: Breach of Michael Liberatore's employment contract against Defendant LETH.

point the Defendants renewed their respective motions for summary judgement and made

motions for judgment under FED R. CIV P. 50.   The Court **DENIED** both Defendants' renewed

motions for summary judgment, and discussed its reasoning in the record.  As stated above, this

Order explains the Court's reasoning as to the denial of both Defendants' Rule 50 motions.[6]

### FACTUAL BACKGROUND[7]

Prior to November 2000, Plaintiffs Anthony Liberatore, Elizabeth Liberatore, Michael

Liberatore, and Mark Liberatore ("Plaintiffs") were the majority owners and controlling

shareholders of Health-Pak.  Health Pak, Inc. (hereinafter, "HP, DE") was a Delaware

corporation whose sole asset was its wholly owned subsidiary, Health-Pak, New York

(hereinafter, "HP, NY").  On June 7, 2000, HP, NY filed petition for protection under Chapter 11

of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern

District of New York.[8]  Prior to November 2000, Life Energy and Technology Holdings, Ltd.

("Holdings, Ltd.") was a corporation organized under the laws of the Republic of Ireland.

Holdings, Ltd. and HP, DE executed an Agreement and Plan of Reorganization dated November

3, 2000 ("Reorganization Plan").  See Ex. P1.  Under the Reorganization Plan, Holdings, Ltd.'s

shares were to be exchanged for an equal number of HP, DE shares after which Holdings, Ltd.

would become a wholly owned subsidiary of HP, DE, see Reorganization Plan ¶ 1.01, Ex. P1;

---

[6]On April 28, 2005, the jury returned a verdict against Defendants LETH and Hartke.  Judgment was entered in favor of Plaintiffs on the same date except as to punitive damages.

[7]The facts are stated in the light most favorable to Plaintiffs and are not factual findings for any other purpose other than a ruling upon the Rule 50 motions.  Unless a specific exhibit is cited, the facts recited here were presented through testimony during Plaintiffs' case.  In reaching the factual basis for this ruling upon the Rule 50 motions, the Court has relied only upon the evidence produced in the Plaintiff's case in chief.

[8] The Chapter 11 proceeding was converted to a Chapter 7 proceeding on November 24, 2003.

further, the shareholders of Holdings, Ltd. would become the controlling shareholders of HP,

DE.  See Chart of Corporate Succession, attached to this Order.

### Acquisition of Health-Pak

The Reorganization Plan lists several conditions precedent to closing, one of which is that

"[HP, DE] shall have entered into an agreement...which shall provide for the acquisition by

Anthony J. Liberatore of all of the outstanding common stock of the [HP, NY] subsidiary and the

plant facility in Utica, New York in exchange for approximately 4,119,382, shares of common

stock of [HP, DE] owned by Mr. Liberatore and his family."  Reorganization Plan ¶ 5.16, Ex. P1.

Accordingly, the parties also executed an Acquisition Agreement on November 3, 2000.  See Ex.

P2.  The Acquisition Agreement states in relevant part: "The parties agree that simultaneously

with the Closing of the [Reorganization Plan] Liberatore shall acquire all of [HP, NY] Shares

from [HP, DE] in consideration for that number of the shares of Common stock of [HP, DE]

currently owned by Liberatore which, after giving consideration to the planned reverse split[9] of

such common shares as contemplated by the [Reorganization Plan], will leave Liberatore as the

owner of 100,000, post-reverse shares of [HP, DE] common stock."[10]  Id.  The closing of the

reorganization took place on December 4, 2000.  Pursuant to the Agreement and Plan, Holdings,

Ltd. became a wholly owned subsidiary of HP, DE.  See Reorganization Plan ¶ 1.01, Ex. P1.

The controlling shareholders of Holdings, Ltd. became the controlling shareholders of HP, DE.

After the closing on December 4, 2000, HP, DE changed its name to Life Energy and Technology

---

[9]The planned reverse split never took place.

[10] "For purposes of this Provision, the number of [HP, DE] shares owned by Liberatore shall also include any and all such shares owned by Liberatore, his wife and Michael Liberatore, his son, it being understood and agreed that the ownership of the Residual Shares shall be as determined by Liberatore."  Id.

Holdings, Inc.

On December 6, 2000, the Liberatores delivered approximately 3,949,333 shares to LETH's then Secretary, Todd Walker.  See written receipt of shares by Walker dated December 6, 2000, Ex. P104.  Walker delivered those shares to McCormack.  At this point McCormack did not transfer HP, NY to the Liberatores as the Acquisition Agreement required, but returned the shares to Anthony Liberatore as LETH was considering keeping HP, NY.  However, at a Board of Directors meeting held in Utica, NY on March 19, 2001, LETH Chairman Albert Reynolds recommended that the Company divest itself of HP, NY.  McCormack and Anthony Liberatore then negotiated new terms for the purchase of HP, NY by the Liberatore family.  These negotiations are represented in LETH's stock filings.

> As part of the acquisition of [Holdings, Ltd.] , pursuant to the Acquisition Agreement, it was agreed that the Liberatore Family, the principal shareholders of [HP, DE] prior to the acquisition of [Holdings, Ltd.], would acquire all of the issued and outstanding shares of [HP, NY] in exchange for the surrender of approximately 1,000,000 of the LETH shares owned by them (subject to adjustment based upon a number of considerations yet to be finalized).  The number of Shares to be surrendered by the Liberatore Family was negotiated by the new management of [LETH] and reflected the agreement to transfer the building and property located at 2005 Beechgrove, Utica, NY to [LETH] from [HP, NY].

See LETH's 10K Form filed with the SEC for the quarter ended May 31, 2001 p.4-5, Ex. P146; see also 10K Form filed with the SEC for the quarter ended May 31, 2002 p.5, Ex. P148.

In November 11, 2002 letter, Defendant Hartke wrote a letter to McCormack (which was made known to the Liberatores) stating that all of the 4,119,382 Liberatore shares would have to be cancelled in order to avoid shareholder liability suits.  See Ex. P117.  Anthony Liberatore and McCormack then renegotiated the deal.   Pursuant to this deal, LETH would fund a bankruptcy

plan of reorganization for HP, NY[11] and convey HP, NY to Anthony Liberatore in exchange for

2,829,333 shares of stock owned by the Liberatores.  Additionally, McCormack represented to

the Liberatores that the surrendered shares would be held in escrow and used in part to fund the

reorganization, with the remainder of the shares to be cancelled.  This agreement was reflected in

a November 20, 2002 memorandum drafted by McCormack in which Anthony Liberatore was to

fill in information regarding dates of transactions listed in the letter and then sign.  See Ex. P95.

The purpose of the letter was to memorialize the number of shares that the Liberatores would

return to LETH as consideration for the purchase of HP, NY.

Between December 2002 and early 2003, the Liberatores sent McCormack 2,829,333

shares ("2.8 million") of LETH stock.  These shares were not cancelled or used to fund the

bankruptcy. Instead, they were transferred to various individuals without the Liberatores'

knowledge.  Defendant Hartke wrote several opinion letters dated December 12, 2002 to March

---

[11] Other proffered documents show that McCormack had been representing to the Liberatores at least since February 6, 2001 that he or LETH would fund the bankruptcy plan of HP, NY.  See Ex. P121, a letter dated February 6, 2001 from McCormack to Michael Balanoff, bankruptcy counsel for HP, NY (LETH is arranging to fund in the amount of approximately $560,000 the Chapter 11 plan filed by HP, NY); Ex. P120, letter dated July 11, 2001 from McCormack and Anthony Liberatore to Judge Gerling (stating that LETH is raising $500,000 to fund the reorganization and proposing to put 500,000 shares of LETH in escrow to fund the plan); Ex. P122, letter dated January 31, 2002 from McCormack to Balanoff (confirming that LETH will provide funding for the second amended plan of reorganization by providing $130,000 at the time of plan confirmation and $20,000 per month for 36 months if the HP, NY "profits are not appropriate to fund the monthly plan payments"); Ex. P59, email dated June 19, 2002 from Michael Liberatore to Balanoff, Noreen Wilson, McCormack, and Anthony Liberatore (memorializing the discussion between those parties that afternoon; listing three sources from which LETH would try to obtain funding for the plan; and then stating "If all else fails Dr. McCormack has agreed to fund the modified plan from his personal funds and will provide suitable financial disclosure"); Ex. P156, statement by the LETH Directors, signed by McCormack, Anthony and Michael Liberatore, and William Meola dated December 16, 2002 (stating "the Company hereby authorizes the funding of the second amended plan of reorganization of the Company's subsidiary [HP, NY] as follows: $130,000 at the time of plan confirmation and $20,000 per month for 36 months"); Ex. P510, letter from McCormack to Anthony Liberatore dated August 21, 2002.  See also, Ex. P154 p. 7, Second Amended Disclosure Statement of Debtor, HP, NY filed in bankruptcy court August 23, 2002; P159 p.7, Third Amended Disclosure Statement of Debtor filed in bankruptcy court (date stamp illegible); Ex. P160 p.9, Third Amended Plan of Reorganization filed in bankruptcy court January 28, 2003.

5, 2003 to authorize these transfers.  See Ex. P103 and Ex P102.[12]  Despite receiving the

Liberatores' shares, LETH never conveyed HP, NY to Anthony Liberatore.  In fact, the original

shareholders and founders of Holdings, Ltd., including McCormack, met on December 20, 2002

and passed a resolution stating that the 2.8 million shares were to be transferred to them or their

designees and that they would try to get the remaining shares from the Liberatores, taking legal

action if necessary.  See Ex. P633.  McCormack did not inform the Liberatores of this meeting,

nor did Hartke, who was aware of the meeting and resolution.  On March 5, 2003, Defendant

Hartke issued a transfer letter, stating that Michael Liberatore had entered into private

transactions to sell certain shares to Irish individuals and that Michael Liberatore had requested

that Hartke write the transfer letter.  See Ex. P102.  Michael Liberatore never gave permission to

Hartke to author this letter and never entered into the private transactions with the Irish

individuals.  When confronted by the Liberatores in the spring of 2003, Hartke denied that he

authored the transfer letters.

Hartke also sent two emails on April 23, 2003 to Michael Balanoff,  HP, NY's

bankruptcy counsel, informing him that he was not to take direction from Anthony or Michael

Liberatore with regard to the bankruptcy.  See Ex. P448, P260.

In November 2003, Hartke wrote a letter to the judge presiding over HP, NY's

---

[12]The letters are as follows:

Ex. P103
1.  December 12, 2002: re: 729,222 shares from Anthony and Elizabeth Liberatore to Sean O'Cearbhaill.
2.  January 14, 2003     re: 208,334 shares from Anthony and Elizabeth Liberatore to Kevin McCormack
3.  January 14, 2003     re: 83,333 shares from Anthony and Elizabeth Liberatore to Brendon McCormack.
4.  January 14, 2003     re: 62,500 shares from Anthony and Elizabeth Liberatore to Mark O'Carroll.
5.  January 14, 2003     re: 62,500 shares from Anthony and Elizabeth Liberatore to Philip O'Carrol.
6.  January 14, 2003     re: 83,333 shares from Anthony  and Elizabeth Liberatore to Brian Larkin.

Ex. P102
1.  March 5, 2003        re: 1,600,000 shares from Michael Liberatore to various individuals.

bankruptcy in which he made several allegations regarding the Liberatores and their management of HP, NY.  See Ex. P84.  Hartke was not HP, NY's banrkrupcty counsel.  Michael Balanoff, HP, NY's bankruptcy counsel testified that the letter was the "kiss of death" to the bankruptcy plan.   HP, NY's Chapter 11 bankruptcy proceeding was converted to a Chapter 7 proceeding on November 24, 2003 and HP, NY was liquidated.

## STANDARD FOR RULE 50 MOTIONS

"If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue." FED R. CIV. P. 50(a)(1). "A court may grant such a motion only 'if, viewing the evidence in the light most favorable to the nonmoving party and drawing every legitimate inference in that party's favor,' it determines that 'the only conclusion a reasonable trier of fact could draw from the evidence is in favor of the moving party.'" Figg v. Schroeder, 312 F.3d 625, 635 (4th Cir. 2002), quoting Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc., 87 F.3d 654, 656-57 (4th Cir. 1996).

<u>MERITS</u>

I.     **Count 1: Fraud against Defendants Hartke and LETH**.

   **A. Fraud against Defendant LETH**

      **1.  Can Plaintiffs simultaneously bring a claim of breach of contract and a claim of fraud?**

Defendant LETH argues that Plaintiffs cannot bring a fraud claim unless they assert that LETH violated a duty independent of its duty to perform under any contract.  The first question before the Court is whether to apply New York law or Virginia law to this question.

      **a. Choice of Law analysis**

As New York law applies to both the breach of contract and the fraud claims, the Court will apply New York law to determine whether the Plaintiffs have an independent basis for their fraud claim.

      **I. Breach of Contract**

A federal court sitting in Virginia and exercising diversity jurisdiction applies Virginia's choice of law rules.  <u>See</u>  <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941). Under Virginia law, the law of the place where the contract was made governs questions of interpretation, validity, and enforceability of a contract, <u>see Johnson v. MPR Assocs., Inc.</u>, 894 F. Supp. 255, 258 n.1 (E.D. Va. 1994), but the law of the place of performance governs questions arising in connection with performance of contractual duties, <u>see Ins. Co. of N. Am., Inc. v. United States Gypsum Co.</u>, 639 F. Supp. 1246, 1248 (W.D. Va. 1986).

Here, the Court notes that the November 3, 2000 Agreement designates Florida law as the controlling law and the accompanying Acquisition Agreement designates New York law;

9

however, the parties' designation as to choice of law in those two agreements is irrelevant, as

Plaintiffs have presented evidence through which the jury found that both of these agreements

were abandoned by the parties and that the breach of contract claim arose from an agreement

made subsequent to the parties' abandonment of the two November 3, 2000 agreements.[13]  As

New York would be the place of the formation of the subsequent agreement and the place of the

performance of the subsequent agreement, New York law governs the breach of contract claim.

### ii. Fraud

In determining which state's law to apply to a tort action, Virginia conflict of law rules

follow the lex loci deliciti rule.  See Buchanan v. Doe, 246 Va. 67, 70 (Va. 1993).  The "place of

the wrong for purposes of the lex loci delicti rule... is defined as the place where 'the last event

necessary to make an act liable for an alleged tort takes place.'"  Quillen v. International Playtex,

Inc., 789 F.2d 1041, 1044 (4th Cir. 1986) (applying Virginia conflicts of law rules), quoting

Miller v. Holiday Inns, Inc., 436 F. Supp. 460, 462 (E.D. Va. 1977).  See also Insteel Indus. v.

Costanza Contr. Co., 276 F. Supp. 2d 479, 486 (E.D. Va. 2003), quoting the RESTATEMENT

(FIRST) OF CONFLICTS OF LAW § 377 n.4[14] ("When a person sustains loss by fraud, the place of

wrong is where the loss is sustained, not where fraudulent representations are made.").

As Plaintiffs reside in New York and the corporation had its principle place of business

---

[13]  The issue of abandonment of these contracts was subitted to the jury and its verdict for plaintiffs and its computation of damages for fraud illustrate that the jury found abandonment and the formation of a new agreement.

[14]  Note 4 to Restatement  § 377 has the following illustrations:
"in state X, A makes false misrepresentations by letter to B in Y as a result of which B sends certain chattels from Y to A, in X.  A keeps the chattels.  The place of the wrong is in state Y where B parted with the chattels."

"A, in state X, owns shares in the M company.  B, in state Y, fraudulently persuades A not to sell the shares. The value of the shares falls. The place of wrong is X."

there during the relevant time period, any loss sustained by the Plaintiffs would have occurred in New York.  Accordingly, this Court will apply New York law to the fraud action.

### b. Defendant LETH's Argument under New York law

Under New York law, there appears to be two separate lines of cases addressing when a plaintiff may simultaneously bring a breach of contract claim and a fraud claim.  See Lam v. American Exp. Co. ("Lam "), 265 F.Supp.2d 225, 230 (S.D.N.Y. 2003).  As the Lam court explained:

> Some [courts] have held that a contractual obligation "'made with a preconceived and undisclosed intention of not performing it, ... constitutes a misrepresentation'" for purposes of a fraud claim that is not duplicative of a contract claim. [citations omitted].  Others have declared that "a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meets its contractual obligations." [citations omitted].  The Second Circuit [in Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.[15]] has endeavored to resolve this apparent conflict, indicating that the latter line of cases represents the general principle, while the former are individual applications of this rule providing for certain exceptions.

Lam, 265 F.Supp.2d 225, 230 (S.D.N.Y. 2003).

To meet one of the exceptions, a plaintiff must either (I) seek special damages that are caused by the misrepresentation and unrecoverable as contract,  (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract, or (iii) demonstrate a legal duty separate from the duty to perform under the contract.  See Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 20 (2nd Cir. 1996).

This Court finds the reasoning of the United States Court of Appeals for the Second Circuit to be persuasive.  Accordingly, this Court will determine whether the Plaintiffs have presented evidence through which a jury could find that the Plaintiffs have met one of the three

---

[15] 98 F.3d 13, 20 (2nd Cir. 1996).

exceptions articulated above.

## I. Do Plaintiffs seek special damages that are caused by the misrepresentation and are unrecoverable as contract damages?

In <u>Fort Howard Paper Co. v. William D. Witter, Inc.</u>, the United States Court of Appeals for the Second Circuit applying New York law noted that a party's "request for punitive damages distinguishes the fraud claims for those in contract," unless the Court finds that the party could not recover punitive damages as a matter of law. 787 F.2d 784, 793 (2nd Cir. 1986). Plaintiffs have requested punitive damages in this case and, as will be explained in section IV of this Order (p.26), the Court holds that the Plaintiffs have presented sufficient evidence through which a jury could find that punitive damages are warranted.

New York law also makes a distinction between the measure of damages recoverable for fraud and the measure of damages recoverable for breach of contract. "Under New York law, the measure of damages for fraud is governed by the 'out of pocket rule'." <u>Fort Howard</u>, 787 F.2d at 793 n.6, citing <u>Dress Shirt Sales , Inc. v. Hotel Martinique Assocs.</u>, 12 N.Y.2d 339, 343 (1963). Conversely, the measure of damages for breach of contract is governed by the "benefit of the bargain rule." <u>Id.</u>

Here, the jury could find that the Liberatores' "out of pocket" damage for fraud is the value of the 2.8 million shares on the day that they surrendered them to LETH. Conversely, the jury could find that the Liberatores' "benefit of the bargain" damage for breach of contract is the value of a "bankruptcy free" HP, NY, or in other words, the value of the assets of HP, NY, unencumbered by bankruptcy debt.

Because the Plaintiffs seek punitive and "out of pocket" damages and also have presented

evidence through which the jury could award such damages, the Court **FINDS** that the Plaintiffs

seek damages that are not recoverable as contract damages.  See e.g, Fort Howard, 787 F.2d 784,

794-95 ("By restricting a fraud claimant solely to an out-of-pocket recovery, along with any

punitive damage award a jury may assess, it is possible to return the claimant to the same

position he occupied before the fraud was committed without facing the attendant risk of

indirectly enforcing a contract otherwise barred by the Statute of Frauds.").



### ii. Did Plaintiffs present evidence through which a jury could find that LETH made a fraudulent misrepresentation collateral or extraneous to the contract?

Plaintiffs have presented evidence in support of their breach of contract claim through

which a jury could find that the agreement between the parties was that the Liberatores were to

surrender 2.8 million shares in exchange for the funding of bankruptcy plan of HP, NY and the

subsequent conveyance of HP, NY to the Liberatores.  See section III of this Order (p.26).

### aa. Fraudulent misrepresentations collateral to the contract

Plaintiffs have also presented evidence through which a jury could find that LETH made

a fraudulent misrepresentation collateral or extraneous to the contract, namely that LETH

misrepresented to the Liberatores that their shares had to be cancelled in order to avoid

shareholder liability suits.

The elements of fraud under New York law which Plaintiffs must prove are that

Defendant LETH:[16]

---

[16] The acts and knowledge of officers, employees, and agents can be imputed to a corporation.  In a case of fraud, a corporation is liable for the fraudulent acts of its officers, employees and agents committed within the scope of their authority.  Even if an officer, employee, or agent acts outside the scope of his or her authority, the corporation is liable when it ratifies the fraudulent acts and retains the benefits derived from them.

1)  made a representation of material fact to the Plaintiffs.

Plaintiffs have presented a letter dated November 11, 2002 written by LETH corporate attorney Hartke to McCormack stating that all 4,145,942 million of the Liberatores' shares had to be cancelled or else LETH could face shareholder liability suits.   See Ex. P117.  From that evidence and the testimony, the jury could find that McCormack either showed the letter to the Liberatores or informed them of its contents, specifically the part about their shares having to be canceled in order to avoid a shareholder liability suit.

2)  the representation was false.

Plaintiff presented a letter dated December 12, 2002 written by Hartke to a stock transfer agent, which authorized the agent to lift the legend from 729,222 shares of Anthony and Elizabeth Liberatore's stock.  This letter was the first of many letters written over the next few months by Hartke authorizing the transfer of Liberatore stock.[17]  From this evidence, the jury could find that the representation was false since LETH began transferring Liberatore shares as early as December 12, 2002, just one month after Hartke's letter stating that the Liberatores' shares must be cancelled.

3)  knew the representation was false or made the representations recklessly without regard to whether it was true or false.

The jury could find that LETH never intended to cancel the shares.  Plaintiffs presented a resolution passed at a meeting of the Board of Directors and the Founding Shareholders ("Holdings, Ltd. Founders"), including McCormack, of Life Energy Technology Holdings

---

Here, LETH is liable for the fraudulent acts of Hartke and McCormack.  Hartke and McCormack may also be liable in their individual capacities for their own fraudulent acts.  Plaintiffs' claim against Defendant Hartke will be addressed in section I(B) of this Order (p.22); McCormack, however, has not been served.

[17] See footnote 12 for list of transfer letters.

14

Limited, the Irish company that merged with HP, DE in November 2000, referred to in this Order as "Holdings, Ltd."  See Ex. P633.  Although this meeting occurred after the representation in Hartke's November 11, 2002 letter, the jury could infer from this resolution that McCormack and these other Holdings, Ltd. Founders had for some time been seeking "the return of 4,119,382 shares from the Liberatores to the original shareholders" or to their designees, and not to treasury to be cancelled.  For example, McCormack updated the Holdings, Ltd. Founders on the "*status* of the return" of the 4,119,382 shares and "[a] heated discussion followed on the subject of why [Anthony] Liberatore *had been* allowed" to keep the shares, implying that the Holdings, Ltd. Founders had wanted to take back the shares for some time, not cancel them.

4) made the representation to induce the Plaintiffs to rely on it.

Based on the evidence, the jury could find that LETH made the representation to induce Plaintiffs to rely on it.

5)  The Plaintiffs justifiably relied upon LETH's representation.

Based on the evidence, the jury could find that the Plaintiffs justifiably relied on the legal opinion of Hartke, LETH's corporate attorney and also that they justifiably relied on the representation of McCormack, with whom they had a fiduciary relationship as explained in section I(A)(1)(b)(iii) of this Order (p.17).

### bb. Concealment of material facts collateral to the contract

Plaintiffs have also presented evidence through which a jury could find that LETH concealed material facts collateral to the contract which LETH was in good faith bound to disclose.[18]

---

[18]The jury was instructed that Defendants LETH and Hartke could be found liable not only for making fraudulent misrepresentations but also for concealing material facts.

The jury could find that the LETH was in good faith bound to disclose the following:

1) that the Holdings, Ltd. Founders resolved to obtain the rest of the Liberatores' shares through legal means if necessary.  McCormack attended the Holdings meeting of December 20, 2002 and Hartke had knowledge of the meeting.  As Defendant LETH admitted in its answer that "Defendant McCormack enjoyed a special confidential and fiduciary relationship with Anthony and Michael Liberatore"[19] and Hartke also testified as such, the jury could find that the both McCormack and Hartke had a duty to inform the Liberatores of the Holdings, Ltd. Founders' designs.

2) that Hartke sent two emails dated April 23, 2003 informing Michael Balanoff, the bankruptcy counsel HP, NY that he was not to take directions from Anthony Liberatore or Michael Liberatore.  See Ex. P448, Ex. P260.  Hartke also testified that he sent these emails to Balanoff at the direction of McCormack.  Neither Hartke nor anyone at LETH informed the Liberatores that Hartke had so advised Balanoff.   Again, due to the relationship between Hartke, McCormack and the Liberatores, the jury could find that they had a good faith duty to inform Anthony Liberatore and Michael Liberatore that, despite their status as both officers and members of the Board of Directors,[20] they no longer had the power to direct the actions of Balanoff with regard to the bankruptcy proceeding of HP, NY.

3) that in November 2003, Hartke wrote a letter to the judge presiding over HP, NY's bankruptcy in which he made several allegations regarding the Liberatores and their management of HP, NY.  See Ex. P84.  Hartke again testified that he wrote this letter at the direction of

---

[19] See LETH Answer to First Amended Complaint ¶ 77 (Doc. 79).

[20] Michael Liberatore and Anthony Liberatore resigned as officers of LETH on July 17, 2003 and directors on January 24, 2004.

McCormack.   The jury could find that McCormack and Hartke had a good faith duty[21] to inform

Anthony Liberatore and Michael Liberatore that they had questions about their management

before writing the letter or at least to inform them that they had written the letter.

### iii. Did Plaintiffs present evidence through which a jury could find that LETH owed Plaintiffs a legal duty separate from the duty to perform under the contract?

> "Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another." *Penato v. George,* 52 A.D.2d 939, 383 (2d Dep't 1976). "A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Restatement (Second) of Torts § 874, cmt. a. "While the 'exact limits' of what constitutes a fiduciary relationship are 'impossible of statement,' a fiduciary relationship may be found in any case 'in which influence has been acquired and abused, in which confidence has been reposed and betrayed.'" *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F.Supp.2d 198, 218 (S.D.N.Y.2002) (quoting *Penato,* 383 N.Y.S.2d at 904).

See Moses v. Martin, 360 F.Supp.2d 533, 543 (S.D.N.Y. 2004).

Plaintiffs have presented evidence through which the jury could find that the Liberators

had a fiduciary relationship with both McCormack and Hartke.  The Liberatores and McCormack

had conducted a merger together, served together on the LETH Board of Directors, and worked

together as officers of LETH.   Further, as LETH stockholders the Liberatores had reason to trust

that McCormack as President/CEO and Hartke as the corporate attorney of the corporation would

do what McCormack had represented he would do with their stock.

---

[21] In addition to any fiduciary duty that the jury may find that Hartke owed the Plaintiffs, both the New York and Virginia Codes of Professional Conduct impose a duty on corporate attorneys to disclose to directors any conflict of interest and explain that the lawyer is the lawyer for the organization and not for the directors.  See 22 N.Y.C. R.R. § 1200.28; see Va. R. Prof. Conduct § 1.13(d).  Hartke is a member of the Virginia Bar with his office in Falls Church, Virginia.

Additionally, Defendant LETH admits in its answer that "Defendant McCormack enjoyed a special confidential and fiduciary relationship with Anthony and Michael Liberatore" <u>See</u> LETH Answer to First Amended Complaint ¶ 77 (Doc. 79).  Hartke's testimony corroborated this statement.

Given that Plaintiffs presented evidence through which a jury could find that LETH owed Plaintiffs a legal duty through their fiduciary relationship separate from the duty to perform under the contract, the jury is not limited to finding that LETH made fraudulent misrepresentations or concealed material facts collateral to the contract.[22]  Therefore, in this section, the Court will examine what evidence the Plaintiffs have presented through which a jury could find that LETH is liable for fraud in general.

### aa.  LETH's fraudulent misrepresentations in general

LETH fraudulently misrepresented to the Liberatores that the approximately 2.8 million shares that the Liberatores returned would be held in escrow until a time when a certain number of these shares would be used to fund the HP, NY bankruptcy reorganization plan, at which point the remaining shares would be cancelled.

The elements of fraud under New York law are that Defendant:

1) made a representation of fact to the Plaintiffs.

Michael Liberatore testified that McCormack represented to the Liberatores that approximately 2.8 million shares that the Liberatores returned would be held in escrow until a

---

[22] Plaintiffs do not have to meet all three of the exceptions, just one.  Therefore, once Plaintiffs meet the requirement of this exception by presenting evidence through which a jury could find that LETH owed Plaintiffs a fiduciary duty, the Court is not limited by "the fraudulent a misrepresentation collateral to the contract" requirement of the first exception when explaining Defendant LETH's fraudulent scheme. Thus, the fraudulent misrepresentations and concealment described in this section will be broader than those described in the previous section.

time when a certain number of these shares would be used to fund the HP, NY bankruptcy

reorganization plan, at which point the remaining shares would be cancelled.  Also, McCormack

had represented since February 2001 that LETH would fund the bankruptcy.[23]  From this

evidence, the jury could find that McCormack made the above-referenced representation to the

Plaintiffs.

    2) that the representation was false.

    Plaintiff presented a transfer letter dated December 12, 2002 written to the stock transfer

agent by Hartke, which authorized the agent to lift the legend from 729,222 shares of Anthony

and Elizabeth Liberatore's stock .  This transfer was the first of many letters written over the next

few months by Hartke authorizing the transfer of Liberatore stock.[24]  Further, Michael Liberatore

and Michael Balanoff, HP, NY's bankruptcy counsel, testified that the bankruptcy plan was

never approved because the requisite funding was never in place.  From this evidence, the jury

could find that the shares were not used to fund the bankruptcy and were not cancelled but were

instead transferred to individuals associated with McCormack.

    3) knew that the representation was false or made the representation recklessly without

regard to whether it was true or false.

    The jury could find that LETH never intended to cancel the shares or use the shares to

fund the bankruptcy.   Plaintiff presented a resolution passed December 20, 2002 at a meeting of

the Holdings, Ltd. Founders.  As explained in section I(A)(1)(b)(ii)(aa) of this Order (p.13), the

jury could infer from this resolution that McCormack and these other founders had for some time

---

[23] See footnote 11 for list of funding letters.

[24] See footnote 12 for list of transfer letters.

been seeking "the return of 4,119,382 shares from the Liberatores to the original shareholders" or to their designees, and that McCormack had no intention of sending the shares to treasury to be cancelled or to the bankruptcy court for the funding of the bankruptcy plan.  From the proximity of both the date of the Holdings, Ltd. Founders' Resolution (December 16, 2002) and Hartke's first transfer letter (December 12, 2002) to McCormack's November representation, the jury could find that McCormack knew the representation was false when he made it.

Further, Plaintiffs presented a statement by the LETH Board of Directors[25] issued December 16, 2002, resolving that LETH would fund the second amended plan of reorganization of HP, NY.   From this evidence, the jury could find that if McCormack could authorize the first transfer of Liberatore stock December 12, 2002 and then four days later sign his name to a document stating that LETH would fund the bankruptcy, he could have never intended to use the Liberatore shares to fund the bankruptcy in the first instance.

Additionally, Plaintiffs presented a letter written by LETH corporate attorney Hartke to the bankruptcy judge, which alleges malfeasance on the part of the Liberatores.  Hartke testified that he wrote the letter at the request of McCormack.   The jury could find that this letter is evidence that McCormack never intended to use the Liberatore shares to fund the bankruptcy plan and that Hartke sent the letter to the bankruptcy judge with the intent of undermining the bankruptcy and therefore causing the bankruptcy judge to convert the proceeding to a Chapter 7 liquidation so that LETH would never have to fund the bankruptcy plan.

4) made the representation to induce the Plaintiffs to rely on it.

The jury could find that McCormack made the representation in order induce the

---

[25]Signed by McCormack, Anthony and Michael Liberatore, and William Meola.

Plaintiffs to rely on it and surrender the 2.8 million shares.  As explained, Plaintiffs presented in evidence the Holdings, Ltd. Founders' Resolution from which the jury could find that McCormack and the Founders had been seeking the Liberatores' shares for some time.

5) The Plaintiffs justifiably relied upon LETH's representation.

As explained above, the jury could find that the Plaintiffs had a fiduciary relationship with McCormack and therefore trusted his representation.  Further, the jury could find that Plaintiffs had reason to believe that he would fund the bankruptcy since he had been promising in writing to do so since February 2001.

Additionally, the jury could find that the Liberatores believed that their shares needed to be cancelled after reviewing Hartke's November 11, 2002 letter to McCormack stating that all of the Liberatores' 4,145,942 shares needed to be cancelled or else LETH could face shareholder liability suits.  <u>See</u> Ex. P117.


**bb. LETH's Concealment of material facts in general**.

Plaintiffs have also presented evidence through which a jury could find that LETH concealed material facts which LETH was in good faith bound to disclose:

1) that the Holdings, Ltd. Founders were willing to take legal action against the Liberatores to get all of their shares, that Hartke had informed Balanoff to not take direction from the Liberatores, and that Hartke had disparaged the Liberatores in the letter to the bankruptcy court, as described in section I(A)(1)(b)(ii)(bb) of this Order (p.15).

2) additionally, that the shares the Liberatores surrendered in late 2002 were not being held in escrow to fund the bankruptcy nor were being cancelled, but were being transferred to the

Holdings, Ltd. Founders. The jury could find that the both Hartke and McCormack had a good faith duty to inform the Liberatores that the shares were not going to fund the bankruptcy nor were they to be cancelled.

### B. Fraud count against Defendant Hartke

The jury may find Defendant Hartke liable for aiding and abetting Defendant LETH in perpetrating a fraud on the Plaintiffs.   The jury may also find Defendant Hartke liable for making specific fraudulent misrepresentations and concealing material facts.[26]

### 1. Aiding and abetting

The Court instructed the jury that a person may be liable for fraud if he knowingly participates in a scheme to defraud, even if that participation is not by itself sufficient to constitute fraud.  To find Defendant Hartke liable for aiding and abetting, the Plaintiffs must prove the existence of a primary fraud, knowledge of the fraud by Defendant Hartke, and facts showing substantial assistance by Defendant Hartke in the achievement of the fraud.

1)  The jury could find that the Plaintiffs have shown the existence of a primary fraud, see section I(A)(1)(b)(iii) of this Order (p.17) and a primary fraud collateral to the contract, see section I(A)(1)(b)(ii) of this Order (p.13).

2)  The jury could find that Hartke had knowledge of the fraud.  Plaintiffs presented evidence that Hartke was the corporate attorney of LETH, corresponded regularly with McCormack, knew of the Holdings, Ltd. Founders meeting, and authored many of the relevant

---

[26] Defendant Hartke argues that an attorney may rely on the representations made by his or her client and does not necessarily adopt those representations as his or her own.  This argument fails however.  Among other things, the jury is entitled to find that Hartke's representation in the November 11, 2002 letter that the Liberatores' stock must be canceled was his own fraudulent representation and also that Hartke concealed several material facts.

documents, many of which contradicted his own assertion in the letter of November 11, 2002 that the Liberatore's stock must be cancelled.

3)  The jury could find that Hartke substantially assisted in the fraud by letters concealing material facts and by authoring the November 11, 2002 letter to McCormack, the transfer letters, and the letter to the bankruptcy court.

## 2. Misrepresentation

Plaintiffs have also presented evidence through which a jury could find that Hartke made a fraudulent misrepresentation, namely that Hartke misrepresented to the Liberatores that their shares had to be cancelled in order to avoid shareholder liability suits.[27]

The elements of fraud under New York law are that Defendant Hartke:

1) made a representation fact to the Plaintiffs.

Plaintiffs presented the November 11, 2002 letter written by Hartke to McCormack, stating that all of the 4,145,942 shares of the Liberatores needed to be cancelled or else LETH could face shareholder liability suits.  See Ex. P117.  From that evidence, the jury could find that Hartke was aware that the Liberatores as officers and directors of LETH would either see the letter or learn of its contents, specifically that their shares had to be cancelled in order to avoid a shareholder liability suit.

2) the representation was false.

Plaintiff presented a transfer letter dated December 12, 2002 to a stock transfer agent from Hartke, which authorized the agent to lift the legend from 729,222 shares of Anthony and

---

[27] Although the jury may find Defendant Hartke liable for other acts of concealment, Plaintiffs presented evidence of fraudulent misrepresentations by Hartke.  The jury is not limited to finding only fraudulent misrepresentations collateral to the contract in the case of Defendant Hartke, as Hartke was not a party to the contract and the Liberatores have not asserted a contractual claim against him.

Elizabeth Liberatores' stock.  This transfer letter was the first of many letters written over the next few months by Hartke authorizing the transfer of Liberatore stock.[28]  From this evidence, the jury could find that Hartke's representation was false since Hartke began writing transfer letters as early as December 12, 2002, just one month after his letter stating that the Liberatore shares must be cancelled.

3) knew the representation was false or made the representations recklessly without regard to whether it was true or false.

From the close proximity of Hartke's November 11, 2002 letter to his writing of the first transfer letter December 12, 2002, the jury could find that Hartke knew that his representation was false when he made it.  Further, Hartke testified that he was aware of the December 16, 2002 meeting of the Holdings, Ltd. Founders.  As explained in section I(A)(1)(b)(ii)(aa) of this Order (p.13), the resolution created by McCormack and the participants at this meeting implied that the Holdings, Ltd. Founders had been seeking the shares for some time.  From this the evidence, the jury could find that if Hartke was privy to the meeting, he also had known for some time that the Holdings, Ltd. Founders were seeking to get the shares back.

4) made the representation to induce the Plaintiffs to rely on it.

Based on the evidence, the jury could find that Hartke made the representation to induce Plaintiffs to rely on it.

5) The Plaintiffs justifiably relied upon Hartke's representation.

Based on the evidence, the jury could find that the Plaintiffs justifiably relied on the legal opinion of Hartke, the corporate attorney of LETH with whom they had a relationship of trust

---

[28] See footnote 12 for list of transfer letters.

and confidence.

**3. Hartke's concealment of material facts**

Hartke's acts of concealment are identical to those of Defendant LETH.  See section I(A)(1)(b)(iii)(bb) of this Order (p.21).

## II. Count 2: Constructive Fraud and Negligent Misrepresentation against Defendant LETH

The elements of constructive fraud are identical to those of fraud with the addition of one element, that Defendant LETH had a fiduciary or confidential relationship with the plaintiffs. The Court has already explained in section I(A)(1)(b)(ii)(aa) (p.13) and section I(A)(1)(b)(iii)(aa) (p.18) of this Order as to how the jury could find LETH liable for fraud misrepresentations. Therefore, the Court will not repeat the same for those elements common to both fraud and constructive fraud.  Further, the Court also addressed in section I(A)(1)(b)(iii) of this Order (p.17) how the jury could find that the Plaintiffs had a fiduciary or confidential relationship with LETH and its president, McCormack.

Therefore, the jury could find the Defendant LETH liable for constructive fraud.

## III. Count 3: Breach of Contract against Defendant LETH.

Plaintiffs have presented evidence in support of their breach of contract claim through which a jury could find that LETH breached the agreement between the parties that the Liberatores were to surrender 2.8 million shares in exchange for the funding of the bankruptcy plan of HP, NY and the subsequent conveyance of HP, NY to the Liberatores.

They have testified that the deal was as they alleged in the First Amended Complaint. Further, the Reorganization Agreement in November 2000, <u>see</u> Ex. P1, the SEC 10K filed May 2001, <u>see</u> Ex. P146, and the SEC 10K filed May 2002, <u>see</u> Ex. P148, all document a transaction in which LETH was to return HP, NY to the Liberatores in exchange for a certain number of Liberatore shares.  Additionally, Plaintiffs have presented numerous letters from McCormack promising funding for the bankruptcy.  <u>See</u> footnote 11 for list of funding letters.

**IV.  Punitive damages**

Both Defendants LETH and Hartke argue that Plaintiffs have not presented enough evidence through which the jury could award punitive damages.

In order to award punitive damages, Plaintiffs must have submitted evidence from which the jury could find that the Defendants acted wantonly, oppressively, or with such malice as to display a spirit of mischief or criminal indifference to civil obligations.  Malice need not be proved by direct evidence, but may be inferred from the circumstances.

**A. Defendant LETH**

Among the elements upon which punitive damages may be based are the following:

1) The jury could find that LETH authorized Hartke to write the defamatory letter to the bankruptcy court and that LETH did not inform them that Hartke was going to do this or that Hartke had done this.

2) The jury could find that LETH authorized Hartke to inform Balanoff not to take direction from the Liberatores and then did not tell the Liberatores that Hartke had done so.

3) The jury could find that McCormack, as one of the Holdings, Ltd. Founders had been

seeking the surrender of all of the Liberatore shares, that McCormack was willing to pursue legal

action to acquire the rest of the Liberatore shares, and that McCormack did not inform the

Liberatores of any of this.

4) The jury could find that LETH authorized Hartke to write all of the transfer letters and

did not inform the Liberatores about the transfers.[29]

## B. Defendant Hartke

Among the elements upon which punitive damages may be based are the following:

1) The jury could find that Hartke's defamatory letter to the bankruptcy court shows

malice[30] coupled with the fact that he did not inform the Liberatores that he wrote it.

2) The jury could find that Hartke's emails informing Balanoff not to take direction from

---

[29]  During Defendants' case, Plaintiffs also submitted an email dated July 12, 2004 from Barry McFarland to Noreen Wilson and Wayne Hartke, stating in part "I say this because if it is possible, I think it will stress Tony's financial resources and make it tougher for him to deal with the cost of the litigation process he started."  See Ex. P425.  The Court will not consider this email for purposes of Defendants' Rule 50 motions made at the end of the Plaintiffs case.

[30]In his brief on issues raised during the Rule 50 hearing, filed April 25, 2005, Defendant Hartke argues that an absolute privilege attaches to the letter he wrote to the bankruptcy court.

Hartke argues that he filed it on behalf of LETH who was acting in the capacity of a concerned creditor and cites Schwartz v. Bartle, 49 Misc.2d 848, 850 (N.Y.Sup. 1966), which held that potentially libelous letters written by creditors in bankruptcy proceedings are privileged.

Under New York law, privilege applies if the statements arise in the course of a judicial proceeding, are relevant or pertinent thereto, and are made by participants legitimately involved in the proceeding.  Schwartz, 49 Misc.2d at 849.  In bankruptcy proceedings, creditors are "interested parties, as they [are] creditors of the debtor corporations whose estates were being administered in the bankruptcy proceedings." Id. at 850.

Here, LETH is technically a creditor of HP, NY as the sole shareholder.  In fact, LETH's interest is listed in Class 10 of the "Classification and Treatment of Creditors" section of LETH's Fourth Amended Plan of Reorganization.  See Ex. D339.  However, the Court Finds that LETH did not submit the letter in the capacity of a creditor but instead did so in the capacity of a parent company trying to exert control and influence over the bankruptcy proceeding of its subsidiary.  McCormack through Hartke had already shown his interest in controlling HP, NY's counsel Michael Balanoff and his handling of the proceeding by instructing him not to take direction from two of LETH's officers and directors, Michael and Anthony Liberatores.  See P448, P260.  Further, Defendant Hartke's counsel informed this Court during argument that this letter was necessary because LETH had been trying (apparently unsuccessfully) to appear before the bankruptcy court.[a]  Thus, the Court views the letter as an attempt to get in the back door and control the bankruptcy proceeding , specifically by circumventing attorney Balanoff  who referred to this letter during trial testimony in this Court as "the kiss of death" to the Chapter 11 proceeding.
[a]."There was an issue as to whether or not the Bankruptcy Court allowed LETH to appear inside the Bankruptcy Court."  Trial Transcript dated April 22, 2005, p.15:8-11 (Doc. 199).

the Liberatores, who were still directors of the company amounts to malice and that he should have informed them that he was doing this.

3) The jury could find that Hartke knew and never informed the Liberatores that the Holdings, Ltd. Founders had been seeking the surrender, not the cancellation, of all of the Liberatores' shares and that McCormack was willing to pursue legal action to acquire the rest of the Liberatores' shares.

4) The jury could find that Hartke to wrote all of the letters authorizing the transfer and did not inform the Liberatores, including the specific false representations attributed to Michael Liberatore.[31]

### CONCLUSION

The Court **DENIES** Defendants' Rule 50 motions.

The Clerk is **REQUESTED** to send a copy of this order to all counsel of record.

It is so **ORDERED**.

/s/
_____
HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
August 19, 2005

---

[31] On March 5, 2003, Defendant Hartke issued a transfer letter, stating that Michael Liberatore had entered into private transactions to sell certain shares to Irish individuals and that Michael Liberatore had requested that Hartke write the transfer letter. See Ex. P102. Michael Liberatore testified that he never gave permission to Hartke to author this letter and that he never entered into the private transactions with the Irish individuals.

## CHART OF
## CORPORATE SUCCESSION

### Pre-Merger

Health Pak, Inc.  ("HP, DE")[1]

Life Energy and Technology Holdings, Ltd.  ("Holdings, Ltd.")[2]

Health Pak, New York ("HP, NY")

### Post Merger[3]

Life Energy and Technology Holdings, Inc. ("LETH")[4]

HP, NY[5]

### Corporate Name Change

Global Environmental Energy Corp.[6]

---

[1] Prior to November 2000, Plaintiffs Anthony Liberatore, Elizabeth Liberatore, Michael Liberatore, and Mark Liberatore were the majority owners and controlling shareholders of HP, DE, a Delaware corporation whose sole asset was its wholly owned subsidiary HP, NY.

[2] Prior to November 2000, Holdings, Ltd. was a corporation organized under the laws of Ireland.

[3] Holdings, Ltd. and HP, DE executed an Agreement and Plan of Reorganization and an Acquisition Agreement both dated November 3, 2000.

[4] After the closing on December 4, 2000, HP, DE changed its name to Life Energy and Technology Holdings, Inc.

[5] Contrary to the Acquisition Agreement, HP, NY was not sold to the Liberatores, but remained a subsidiary of LETH until HP, NY was liquidated in a Chapter 7 bankruptcy proceeding on November 24, 2003.

[6] In August of 2004, Life Energy & Technology Holdings, Inc. changed its name to Global Environmental Energy Corp. and changed its domicile from Delaware to the Commonwealth of the Bahamas. See Global Environmental Energy Corp.'s Form 10K, F-5, "Nature of Business and Significant Accounting Policies", Ex. 1 in May 20, 2005 hearing.